# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CP-01061-COA

IN THE INTEREST OF J.S., A MINOR AND G.S., A MINOR: BETSI S.                                    APPELLANT

v.

MISSISSIPPI DEPARTMENT OF CHILD PROTECTION SERVICES                                    APPELLEE

DATE OF JUDGMENT:                    08/22/2024
TRIAL JUDGE:                              HON. WALTER JEFFREY BROWN
COURT FROM WHICH APPEALED:    ADAMS COUNTY YOUTH COURT
ATTORNEY FOR APPELLANT:        BETSI S. (PRO SE)
ATTORNEYS FOR APPELLEE:        KIMBERLY GOLDEN GORE
                                          JOSE BENJAMIN SIMO
NATURE OF THE CASE:              CIVIL - CUSTODY
DISPOSITION:                          AFFIRMED - 04/14/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McCARTY AND EMFINGER, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.    After a permanency hearing, a youth court determined that two children should reside with their respective fathers instead of with their mother. The mother appeals, arguing generally that she was deprived due process, the trial court was biased in its rulings against her, and that she is entitled to damages. Finding no error, we affirm.

## BACKGROUND

¶2.    The facts of this case are taken from the uncontested testimony in hearings before the trial court. Betsi S. lived with her two sons, Jarred and Grant.[1] At the time relevant to this

---

[1] This Court uses pseudonyms to refer to minors in cases of this type.

appeal, Jarred was 14 and Grant was 5. The boys each had different fathers; Betsi was in the midst of a divorce from Grant's father.

¶3.     While she had formerly been employed as a teacher, over the years Betsi had stopped working almost entirely. According to Grant's father, she had been navigating mental health challenges and had experienced what he termed a "mental breakdown."

¶4.     Grant had been missing more and more school, eventually tallying 27 tardies and 11 unexcused absences. Jarred's attendance at a local private school wasn't as bad, but one day as he was taking a test Betsi arrived at the school and wanted to check him out.

¶5.     The principal later explained that "[t]here is a policy the school follows and traditionally [the student] ha[s] to stay for the entire exam," so the mother was told her son "couldn't be checked out the middle of the testing."

¶6.     Betsi became insistent. Another witness recalled visiting the school on a job interview, and heard "yelling," including someone yelling "the F-word." "[S]he had gone outside and was irate," and was "beating on the door[.]" The police arrived and Betsi left. The witness said that it was unusual to see "[a] parent acting that way," that it deeply concerned them to the point where "I would ask her to be banned from the campus for at least a semester."

¶7.     While not as developed in the record, around the same time Betsi—still married to her youngest son's father—had a volatile relationship with another man. Her neighbors called the police to intervene in an altercation between her and the man. By the time Jarred's father had arrived, Betsi had left the scene with Grant in the car—leaving her fourteen year old

2

behind.

¶8.    The Adams County Youth Court entered two "Emergency Custody Orders" determining that each boy should live with their respective fathers until a formal adjudication could be held.  Afterwards, the Adams County Prosecuting Attorney filed two roughly identical petitions in Youth Court—one on behalf of Grant, and one on behalf of Jarred. Both petitions sought to have the boys adjudicated as neglected, alleging that their:

> mother is abusing prescription drugs trazadone and adderral, created a major disturbance at the school in front of the children, took them from school without permission, police were called, at home she locked the children out, has someone living with her that should not be supervising the children, she is unable to provide for their care, custody, and supervision due to alleged mental health issues.

The record contains a document signed by Betsi that she "hereby waives the right to receive a copy of . . . her . . . charges . . . at least three days before being ask to plea to said charges or to proceed to any hearing," and "has been fully advised by the attorney for the Respondent of this right and understands and wishes to waive said right." The youth court also appointed her an attorney to represent her in the proceedings.

¶9.    Betsi did not respond to the charges in writing.  Instead, she filed what she would term a "CONFIDENTIAL Disability Related Reasonable Accommodation Request."  Without supporting proof, Betsi claimed to have ADHD, PTSD, anxiety, and "social communication disorder" that she offered "causes [her] extreme difficulty in communicating, thinking, concentrating, and speaking, when under stressful situations."  There were many conditions Betsi wanted placed on the hearings, such as a prohibition on her being asked "multiple questions in a row" or to be kept waiting, and wanted ample "extended deadlines for legal

3

filing and extension requests."

¶10. The record contains orders continuing the adjudication hearing from the original date of June 27, 2024 to July 18, 2024, and then continuing again until August 1, 2024.

*The Adjudication Hearing*

¶11. Despite the signed waiver, having an appointed attorney, and two continuances, Betsi did not appear at the adjudication hearing. The trial court began the hearing noting that the time to begin had passed, but "Ms. Betsi is not here," but had communicated to him she was in a different county, and "[t]hat she was not served anything and no one has told [her] about this court date and this time." So the trial court asked the county prosecutor and appointed attorney for Betsi to establish the procedure which had resulted in the hearing.

¶12. The trial court further noted that Betsi had communicated that "she was firing [her appointed lawyer] from his job as her lawyer" and was "going to represent herself." The State then called a representative from CPS to the stand, and established that CPS had repeatedly communicated the time of the hearing to Betsi. The trial court found that Betsi had been duly noticed and "served with [the] petition the last time we were here," and "signed off on the waiver [of] three-day notice as well."

¶13. Accordingly, the trial court then heard witnesses as to the event at the school, Betsi's mental health challenges, and her alleged neglect of her two boys.

¶14. For instance, the principal of Jarred's school testified that she was concerned for the health, safety, and well-being of students and teachers and staff after his mother's outburst on campus. The witness to the event said that after 30 years in the education field, it was

4

"[p]robably in the top five" conflicts with a parent he had ever seen.

¶15.    Next, the trial court heard from a drug court case manager from the Adams County Youth Court. She testified that she had administered a drug screen to Betsi a couple of weeks before the hearing. The test taken by Betsi "was positive for amphetamines, positive for benzos, positive for cannabis." A subsequent hair follicle test was also positive for amphetamine. Betsi told the case manager she had a prescription for Adderall, but the case manager was not provided with the actual prescription. The witness testified Betsi had told her that she was also using marijuana.

¶16.    Jarred's father testified, and explained how he believed his son being in his custody had improved his life. He believed it was "pretty rough" for his son "to deal with his mom." He described a recent event when Jarred had called him to come pick him up. When he arrived the teen was alone—his mother had left him after her neighbors called the police because a fight with her boyfriend had gotten so loud. She took the younger child and left.

¶17.    Grant's father testified next, and relayed how he believed his son had been negatively affected by Betsi's parenting. "He is pretty much late every day when his mom takes him to school," he testified, and "his sleep pattern is out of whack." Grant's father believed Betsi had been "very suicidal" in the past and "was put in [a] mental facility" for care after she threatened to overdose in front of her sisters. He believed she was buying Adderall "off the street" because she would exhaust the amount she was prescribed. He felt his son was put into an untenable position because "[h]e came home and told me that his mom was arrested," which coming from the 4-year-old, caused him "a lot of concerns." His divorce action with

5

Betsi was still pending.

¶18. After the hearing concluded on August 1, 2024, the youth court entered an adjudication order finding that both children were neglected and emotionally abused. The court also entered a separate disposition order that same day which removed physical and legal custody of both Jarred and Grant from Betsi and placed custody with their respective fathers. An amended disposition order was entered immediately after the original, and a plan of reunification with Betsi was set that required a service agreement with CPS. The trial court did not terminate Betsi's parental rights and that relief was not sought.

¶19. Betsi's first response was to file a "complaint" pursuant to the ADA claiming that the youth court had violated her rights. She then filed a "motion to dismiss" based on "fraud on the court and lack of subject matter jurisdiction," as well as a "motion to quash service."

¶20. On August 22, 2024, the youth court entered a permanency order finding in each case that Betsi had "refused to sign [a] service agreement" for reunification despite having been warned "of the consequences if she didn't comply." The court's permanency orders therefore granted "physical and legal custody" of the children to their respective fathers and specifically "closed" both cases. *See* Miss. Code Ann. § 43-21-651 (Supp. 2024). Betsi subsequently filed a timely notice of appeal.

## STANDARD OF REVIEW

¶21. "Our standard of review in youth court cases is limited," since "[t]he youth court judge is the trier of fact." *R.W. v. Miss. Dep't of Child Prot. Servs.*, 395 So. 3d 63, 68 (¶18) (Miss. 2024). "When challenging a youth court's adjudicatory or dispositional order for

6

sufficiency of the evidence, the standard of review is preponderance of the evidence," and we "consider[] all the evidence in the light most favorable to the State." *Id.*

## DISCUSSION

¶22. On appeal, Betsi raises four core procedural issues, with a series of subissues. She alleges that "The Trial Court Violated Appellant's Due Process Rights," that "Judicial Misconduct Rendered the Trial Structurally Defective," that the "Court violated the A[DA] and Denied Equal Protection," and that she "Is Entitled to Relief Under 42 U.S.C. § 1983." Her core arguments are focused on process and allegations of deficiencies in the process, plus a claim for damages.

¶23. Before proceeding to review, we first note that the Department of Child Protection Services filed a brief in this appeal but did not respond to any of Betsi's arguments. CPS did not respond to her arguments regarding service, whether the trial court should have recused, or whether she was denied an ADA accommodation.

¶24. Instead, CPS filed a brief addressing an argument she did *not* make—arguing that "there is substantial evidence to support the . . . determination" of a change in custody to the boys' respective fathers. This does not assist the Court in reviewing the matter at hand and is effectively the same as if CPS did not file a brief.

¶25. "We have long held that an appellee's failure to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and the brief of the appealing party, that there was no error." *Simpson v. Holmes Cnty. Bd. of Educ.*, 2 So. 3d 799, 803 (¶16) (Miss. Ct. App.

7

2009). However, "[a]utomatic reversal is not required where appellee fails to file a brief." *N.E. v. L.H.*, 761 So. 2d 956, 962 (¶14) (Miss. Ct. App. 2000).

¶26. There is also the fact that this case involves families and children. We have explained that "when matters on appeal touch the welfare of a minor child, then regardless of whether a party filed a brief, this Court will reach the merits of the issues in this appeal, though we proceed unaided by a brief from the appellee." *Id.* (quotation mark omitted). Therefore we address each of Betsi's issues in turn.

## I. Betsi's right to due process was not violated.

¶27. In her pro se brief, Betsi argues that she "was effectively kept out of the room, denied proper notice of the [permanency] hearing and of crucial court dates, and deprived of any meaningful opportunity to be heard." She argues this constitutes "a clear denial of due process" and requires reversal.

¶28. We first reiterate that this case is not a termination of parental rights, but rather involved a claim that Betsi's two boys were neglected and that as a result permanent custody should be with their respective fathers.

¶29. Generally speaking, "When a petition has been filed and the date of hearing has been set by the youth court, the judge or his designee shall order the clerk of the youth court to issue a summons to the following to appear personally at such hearing," including the parent. Miss. Code Ann. § 43-21-501 (Rev. 2023). "Summons shall be served not less than three (3) days before the date set for the adjudicatory hearing of proceedings concerning the child." Miss. Code Ann. § 43-21-507(1) (Rev. 2023).

8

¶30. However, service can be waived and appearances be made voluntarily. "A party other than the child may waive service of summons on himself by written stipulation or by voluntary appearance at the hearing[.]" Miss. Code Ann. § 43-21-507(2). Youth Court Practice Rule 22(a)(1)(i)-(ii) allows that "[t]he clerk does not need to issue summons to . . . any person who has already been served with process or who has already appeared in court proceedings in the cause," or a person "who has received sufficient notice of the time, date, place and purpose of the adjudication hearing."

¶31. The record contains a signed "WAIVER OF THREE DAYS NOTICE" signed by Betsi. While Betsi now argues she did not have notice of the proceedings, the record belies her contention. The attorney who was appointed to represent her appeared at the hearing and pursued her case by cross-examining the witnesses called by the State. There were two continuances before the permanency hearing, and Betsi filed motions before and after the hearing. She also specifically filed a document which purported to regulate how she wanted to be questioned during the hearing due to her claimed disabilities. While she did not attend the hearing, her appointed lawyer did, and cross-examined the witnesses arrayed against her and pursued her defense to the charges.

¶32. The trial court found that Betsi knew the hearing was set and had voluntarily absented herself from the proceedings.

¶33. Even in her version of events, Betsi relayed that she learned of the hearing the day before it occurred from the father of one of her sons, but "was out of town" and was "helping another mother fight a court battle against false allegations by CPS" in a hearing in Simpson

County.

¶34. Before the hearing began on the merits, the youth court heard testimony from CPS and made a finding of fact that Betsi was made aware of the hearing's time, date, and place. The youth court found she was duly noticed, that "[s]he was served with her petition the last time we were here," and that she had "signed off on the waiver and three-day notice as well." We find no error and no violation of Betsi's due process rights.

## II. No motion for recusal was filed and so the issue is procedurally barred.

¶35. On appeal, Betsi claims that the trial court was biased against her and there was "extensive judicial misconduct that warrants reversal and investigation." She essentially claims the youth court should have recused or been disqualified from hearing the case.

¶36. The general rule is that recusal of a trial court must be timely sought or the point will be deemed waived.

> This Court and the [S]upreme [C]ourt have indicated many times that a defendant can waive an objection to the trial judge if there is no motion to recuse or motion to continue filed or if the defendant never raises the issue at any other point during the trial. *Banana v. State*, 635 So. 2d 851, 854 (Miss. 1994); *see also Rice v. State*, 134 So. 3d 292, 300 (¶23) (Miss. 2014); *Kelly v. State*, 553 So. 2d 517, 521 (Miss. 1989); and *Holton v. State*, 189 So. 3d 697,700 (¶¶9-12) (Miss. Ct. App. 2016). "Once a party knows of, 'or with the exercise of reasonable diligence may have discovered,' possible grounds, that party should move for a recusal." *Overstreet*, 17 So. 3d at 623 (¶5) (quoting *Tubwell v. Grant*, 760 So. 2d 687, 689 (¶8) (Miss. 2000)). If the defendant fails to raise these issues, it is "considered implied consent to have the judge go forward presiding over the case." *Id.*

*Day v. State*, 285 So. 3d 171, 179 (¶19) (Miss. Ct. App. 2019).

¶37. Because Betsi did not raise the issue in the trial court, and did not raise it prior to the

permanency hearing, we find she "is procedurally barred from raising this argument now." *Sanford v. State*, 424 So. 3d 410, 413-14 (¶13) (Miss. Ct. App. 2025) (finding a similar argument barred when "Defense counsel did not move for the trial judge's recusal, nor did counsel request a mistrial").

### III. The motion for ADA accommodation was abandoned.

¶38. Betsi argues that the trial court improperly refused her "reasonable accommodations," pointing to a motion she filed prior to the permanency hearing. However, she did not pursue the motion or have a hearing on it prior to the hearing.

¶39. "A moving party has a duty to ensure [her] motion is heard and that a ruling on the motion is obtained." *Hutto v. State*, 227 So. 3d 963, 990 (¶95) (Miss. 2017). In a civil case examining this general rule, we reviewed whether a party was relieved from responding to "discovery requests because she moved to consolidate discovery from the federal court proceeding[.]" *Carter v. Total Foot Care*, 349 So. 3d 775, 782 (¶22) (Miss. Ct. App. 2022). We found that "[f]iling a motion is quite simply not enough." *Id.* For as our Supreme Court has reasoned, "[a] motion that is not ruled upon is presumed abandoned." *Cossitt v. Alfa Ins. Corp.*, 726 So. 2d 132, 135 (¶12) (Miss. 1998).

¶40. Betsi filed a motion for accommodations due to claimed disabilities, but did not notice it for hearing prior to any proceeding and did not obtain a ruling on this motion. *See generally* YCPR 15(c) (governing motion practice); YCPR 15(d)(9) (setting out a prehearing conference can be called by the court "or the motion of any party" to address "such other matters as may aid in the disposition of the action"). Furthermore, Betsi did not appear at any

11

hearing where she was to testify subject to any claimed accommodation. There can be no error on this point as she did not bring her motion on for hearing or obtain a ruling.

¶41. Under this same heading, Betsi also protests she was treated differently as a person proceeding pro se. This mistakes the posture of the case; she was appointed a lawyer, and he cross-examined the witnesses at the permanency hearing despite her absence. While she indicated to the trial court later that she terminated the lawyer's representation, this was never done through formal filing and it is not clear when it occurred.

¶42. In any event, we have long held that "a pro se litigant shall be held to the same standard as an attorney." *In re Est. of Forrest*, 165 So. 3d 548, 550 (¶8) (Miss. Ct. App. 2015). It is true that Betsi filed motions on her own in the youth court. But there is no proof that Betsi was held to a different standard because she did not pursue the motions she filed on her own, as addressed above.

¶43. Last, Betsi argues she was coerced into drug court by the youth court. This matter does not appear to be grounded in the record and she does not cite to the record where such occurred. The Rules of Appellate Procedure require appellants to state "the reasons for th[eir] contentions" and provide "citations to the authorities, statutes, and parts of the record relied on" to support their arguments to the Court. MRAP 28(a)(7). Betsi's failure to cite to the record results in a procedural bar to our review of this point. Betsi also does not link how any "coercion" into drug court would warrant reversal of the permanency orders. We find no error.

**IV. This is not a Section 1983 case.**

12

¶44. Last, Betsi claims that her rights were violated and she is entitled to damages pursuant to federal law. However, 42 U.S.C. § 1983 "creates a cause of action against 'every person' who under color of law deprives another person of his civil rights[.]" *Pryer v. Gardner*, 247 So. 3d 1245, 1252 (¶13) (Miss. 2018). As Betsi seems to recognize, this is a separate action and cannot be bundled into an appeal of a permanency decision.

¶45. To the extent Betsi claims the actions of the youth court violated her rights, we note that the United States "Supreme Court [has] held that the language of the statute itself contained no indication that Congress intended to abolish the hallowed common law principle of judicial immunity to provide a cause of action against a judge for a Section 1983 violation." *Id.*

## CONCLUSION

¶46. For the reasons above, we affirm the permanency orders of the youth court.

¶47. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**